IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Ty'Kee Walmsley, | ) | C/A No.: 0:24-3730-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| Encompass Health Rehabilitation | ) | AND ORDER |
| Hospital of Rock Hill, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Ty'Kee Walmsley ("Plaintiff"), proceeding pro se, sues her former employer Encompass Health Rehabilitation Hospital of Rock Hill, LLC ("Defendant"), claiming it violated the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.* ("ADA") and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* Defendant seeks dismissal of Plaintiff's claims.

Plaintiff alleges claims for wrongful discharge, failure to accommodate, and retaliation in violation of the ADA and for interference and retaliation in violation of the FMLA. This matter comes before the court on Defendant's motion for summary judgment. [ECF No. 63]. The motion is fully briefed [*see* ECF Nos. 66, 67] and ripe for disposition. Also pending before the court are Plaintiff's motions to strike [ECF Nos. 66, 70] and to amend her motion to strike [ECF No. 72], as well as Defendant's motion for sanctions. [ECF No. 69].

Pursuant to 28 U.S.C. § 636(b)(1)(B), and Local Civ. Rule 73.02(B)(2)(e) (D.S.C.), this matter has been referred to the undersigned for all pretrial proceedings. Having carefully considered the parties' submissions and the record in this case, the undersigned grants Plaintiff's motion to amend, denies Plaintiff's motions to strike, denies Defendant's motion for sanctions, and recommends the district judge grant Defendant's motion for summary judgment.

I.     Factual Background

A.     Defendant's Policies

Defendant hired Plaintiff on February 21, 2022, to work as the Hospital's Human Resources Assistant ("HRA"). [ECF No. 63-4 ¶ 5, ECF No. 63-2 at 38:2–18]. Plaintiff worked in this role during her entire tenure with Defendant. *Id.* The parties do not dispute the HRA job description states the HRA "functions as a receptionist to the Human Resource department" and that this position was "the front line for providing customer service to employee and manager needs." [ECF No. 66-12].

Upon her hire, Plaintiff reviewed and acknowledged Defendant's FMLA and Equal Employment Opportunity policies. [ECF No. 63-2 at 27:17–25, 61:2–21, *see also* ECF No. 63-3 at 5–8, ECF No. 63-3 at 9 (employee handbook)]. Plaintiff also acknowledged Defendant's "Disruptive Behavior" and "Cellular

Phone/Mobile Devices" policies at the outset of her employment. [ECF No. 63-2 at 69:15–16, 70:20–25, ECF No. 63-3 at 57–61 (policies)]. Defendant's disruptive behavior policy provides the following examples of inappropriate behavior:

> A. Threatening or abusive language directed at hospital personnel, patients, visitors, allied health professional, physicians or other members of medical staff;
> B. Degrading or demeaning comments regarding hospital personnel, patients, visitors, allied health professional, physicians or other members of the medical staff . . . .
> E. Profanity or similarly offensive language while in the hospital and/or while speaking with hospital personnel, patients, visitors, allied health professionals, or physicians; and . . . .
> G. Refusal to abide by hospital policies.

[ECF No. 63-3 at 58]. The disruptive behavior policy states that violations of the policy may result in corrective action, including "disciplinary action up to and including termination of employment." *Id.*

Defendant's cellular phone/mobile device policy also provides as follows:

Image, Video and/or Audio Recording Devices

The use of personal cameras or other devices to record images, video and/or audio with Company locations is prohibited without the express prior permission of senior management and of the person(s) who is (are) the subject of the image/video/audio.

[ECF No. 63-3 at 60–61]. This policy also states "[v]iolations of this policy could result in disciplinary action up to and including termination." *Id.*

B.     Defendant Hires Jay as the Human Resources Director

Shelly Shellouff ("Shellouff"), Defendant's former Human Resources Director ("HRD"), initially served as Plaintiff's supervisor; however, after Shellouff's resignation in early 2023, Kiona Jay ("Jay") took over the role of HRD and became Plaintiff's supervisor, shortly before Plaintiff took her first medical leave of absence. [ECF No. 63-4 ¶¶ 6, 8–10].[1]

C.     Plaintiff Approved Leaves of Absences

Shortly after Defendant hired Jay, Plaintiff requested her first medical leave of absence pursuant to Defendant's FMLA policy. [ECF No. 63-5 ¶ 8, ECF No. 63-2 at 112:1–3]. However, Plaintiff had not yet been employed for a year, so she was not eligible for FMLA leave. [ECF No. 63-5 ¶ 9, ECF No. 63-5 at 8]. As a result, Plaintiff requested ADA leave from February 12, 2023, through February 20, 2023. [ECF No. 63-3 at 101]. On February 21, 2023, she became eligible for FMLA leave and secured intermittent FMLA leave from February 21, 2023, through February 13, 2024. [ECF No. 63-3 at 78].[2]

---

[1] Jay and Scott Butler ("Butler"), Defendant's CEO, have stated that from the outset of Jay's employment, Plaintiff seemed combative with Jay and was unreceptive to Jay's instructions. [ECF No. 63-4 ¶ 17, ECF No. 63-5 ¶ 38]. Neither Butler nor HR Business Partner Kelly Helms ("Helms") are aware of any other employees who interacted negatively with Jay or complained about Jay in any way. [ECF No. 63-4 ¶ 17, ECF No. 63-6 ¶ 39].

[2] Defendant approved each FMLA and ADA leave of absence requested by Plaintiff that she was eligible for and for which she provided supporting medical documentation. [ECF No. 63-4 ¶¶ 11, 40, ECF No. 63-5 ¶¶ 7, 36, ECF

D.     Plaintiff's Accommodation Requests

On March 13, 2023, Plaintiff returned to work and was still approved for FMLA intermittent leave from February 21, 2023, through February 13, 2024, for "up to 12 treatment(s) or appointment(s) per year lasting up to 12 day(s) per treatment/appointment and for up to 2 episodic incapacitation(s) per month lasting up to 2 day(s) per episode." [ECF No. 63-2 at 122:19–22, ECF No. 63-3 at 89]. On March 14, 2023, Jay and Butler met with Plaintiff to discuss and approve her accommodation request for intermittent leave. [ECF No. 63-4 ¶¶ 13–15, ECF No. 63-4 at 18–19 (accommodation request approval for intermittent leave, dated March 30, 2023)].

Plaintiff also requested, as an accommodation, to be provided dim lighting and a quiet workspace; she made this request, according to Defendant's records, on February 21, 2023, and the request was approved, again according to Defendant's records, effective May 2, 2023, following meetings to discuss the issue. [ECF No. 63-4 at 21].[3] These accommodations

---

No. 63-6 ¶ 8]. Defendant states it is unaware of instances where Plaintiff was required to take more FMLA and/or ADA leave than she requested. [ECF No. 63-4 ¶ 12, ECF No. 63-5 ¶¶ 6, 36, ECF No. 63-6 ¶ 9]. Plaintiff testified that Defendant provided her with all the FMLA leave for which she was certified. [ECF No. 63-2 at 129:12–14].

[3] Plaintiff argues in briefing without supporting evidence that this document was "backdated" and that she refused to sign it. [ECF No. 66-9 at 7].

were to be used "as needed" or when Plaintiff "experience[d] negative side effects of her condition." [ECF No. 63-4 ¶ 14, ECF No. 63-5 ¶ 11].

Additionally, Plaintiff testified that in the meeting Defendant referenced above, Defendant did not approve her accommodations request but instead disputed having the necessary medical certification to accommodate her. [ECF No. 63-2 at 135–18]. Plaintiff has submitted evidence that following an MRI, she received a doctor's note stating that she was allowed to return to work as of May 24, 2023, and "FMLA still needed—can use when needed. Workplace— dim lights, quiet places." [ECF No. 66-13]. Plaintiff has also provided an email interaction between her and Jay dated June 16, 2023, in which Jay stated:

Greetings Tykee-

Your ADA intermittent leave accommodation request was denied on 6/12/23 because you did not submit documentation. I have attached the denial letter for you to review. In order for your leave request to be considered, you are required to have your health care provider complete and return the **"Medical Inquiry Form"**. FMLASource sent this information to you in a letter at the end of May, but I have also attached it to this email as well. Also, you provided a medical note on 6/7/23 in regards to your request for physical accommodations while working at the hospital. I will need clarification from your physician on the **"length of time"** for the ADA accommodations. Please provide this information by June 26th.

[ECF No. 66-14]. Plaintiff has submitted text messages between her and Jay dated June 21, 2023, in which Plaintiff informs Jay that her physician has stated the medical documentation she provided was sufficient, additionally arguing that Jay's email stating more documentation was needed was "insufficient" for her provider to issue another letter. [ECF No. 66-15]. In response, Jay stated as follows:



Tykee,

I sent a clear email about the documentation I needed you to provide me. If your physician said my email is not sufficient then I have to accept the fact that I will not receive a letter from the physician.

Have a good night see you tomorrow.

Same to you. See you tomorrow

[ECF No. 66-15, *see also* ECF No. 66-16 (Plaintiff's email dated June 23, 2023, to Butler and others discussing the same issue)].

Plaintiff has also submitted a letter from her medical provider requesting another letter from Plaintiff's employer before issuing another accommodation letter. [ECF No. 66-17]. Jay provided the following response to the provider, dated June 28, 2023:

Thank you for reaching out regarding the workplace physical accommodations that Tykee needs while working at the hospital. The FMLA/ADA paperwork that you referenced in the email was in relation to Tykee taking any type of FMLA or ADA leave time. This information was requested by FMLASource. Any physical accommodations while working are discussed directly between Encompass and the medical provider. For the letter provided to us on 6/7/23 it stated that she needed "work spaces with dimmed lighting as well as areas of quiet." This letter did not provide a duration for these accommodations. Based on your email, it appears that you are stating these accommodations will be needed through Feb. 2024. Please confirm this information.

*Id.*

E.    Front Desk Request

On May 25, 2023, Jay asked Plaintiff to cover the front desk Monday through Friday for thirty minutes while the front desk receptionist was on her

lunch break. [ECF No. 63-5 ¶ 15, ECF No. 63-5 at 25–29, ECF No. 63-2 at

158:15–17]. In response to this request, the following exchange occurred:

> Plaintiff:    As far as front desk coverage, please remember the
> workplace accommodations for dim lights and quiet
> places. There may be days when that area will affect
> me.

> Jay:    This is only when you are having a migraine you will
> need dim lights and a quiet space. Are you letting me
> know your migraines lasting are all day. Please
> clarify?

> Plaintiff:    Yes. One main concern is daily headaches/migraines
> that rebound. I am cleared to return to work under
> those accommodations to prevent further concerns.
> There are times when the treatment may not work,
> causing a severe migraine disabling proper function/
> ability to perform job duties. Those moments are when
> fmla/ada comes into play . . . .

> Jay:    Let me know when you are not feeling well and are not
> able to perform job duties.

> Plaintiff:    The job accommodations are put into place to assist me
> with my condition. There are times when I will need
> the dim lighting and quiet places, even during a semi-
> normal states. That does not mean, I cannot perform
> my job duties, For an example, currently, I am in the
> office, lights are off, area is quiet, and I am completing
> work fine. If I was sitting up front, the lights would be
> an issue for me. Please let me if this is clear enough to
> understand. If not, I will aim to reword it for your
> liking . . . . Yet, due to my disability, my doctor have
> set reasonable workplace accommodations that does
> not cause an undue hardship on the operation of this
> business to prevent a decline in my health. This new
> daily job duty assigned to begin on May 30, 2022
> requires that I be present in a work area in which the

> lights cannot be dimmed nor is it quiet, as it is the
> front desk. Please inform me on how to proceed when
> completing this duty causes a negative effect on my
> health . . . .

[ECF No. 63-3 at 106–109].[4]

Plaintiff testified that she started working the front desk as requested, although she also testified that she was affected by her condition every day, and she felt she had no choice but to work at the front desk. [ECF No. 63-2 at 156:6–24]. Plaintiff also testified that one day while covering the front desk, she began to feel unwell and was allowed to leave for the day. *Id.* at 158:5–8.

At some point thereafter, Plaintiff verbally requested that Jay remove her from the front desk rotation, and Jay granted her request and told her that she was no longer required to work the front desk. [ECF No. 63-5 ¶ 17]. Jay testified that she "immediately granted her request and told her that she was no longer required" to work at the front desk. *Id.* Plaintiff has offered text message evidence where she informed Jay of days that she could not work the front desk after this point and up until her termination. [ECF No. 66-11].

---

[4] Defendant has submitted evidence that Plaintiff covered the front desk when she was working for Shellouff. [*See, e.g.*, ECF No. 63-4 ¶ 7].

F.     Work Duty Investigation

As the HRD and Plaintiff's supervisor, Jay assigned work duties to Plaintiff. [ECF No. 63-5 ¶ 41]. Helms testified as follows about Plaintiff's complaints about Jay:

> On June 30, 2023, I became aware of complaints that Walmsley emailed to Kristi Crossland ("Crossland"), Regional Vice President of Human Resources for South Atlantic, concerning Jay. The same day, I had a discussion with Walmsley, during which Walmsley made general allegations that Jay did not want to complete her duties and shifted those duties to Walmsley. It seemed to me that Walmsley had personal issues with Jay. During this discussion, Walmsley did not raise any concerns or allude to whether she believed Jay was allegedly shifting job duties to her based on her use of FMLA or ADA leave; she simply did not want to complete the work that Jay was assigning to her.

[ECF No. 63-6 ¶ 15 (citations omitted), *see also* ECF No. 63-6 at 13–15].

On July 5, 2023, Plaintiff emailed Helms again about the job duties Jay assigned to her, and Helms began to investigate the issue. [ECF No. 63-6 ¶ 17, ECF No. 63-6 at 17–22]. On July 14, 2023, Jay forwarded Helms emails from Plaintiff, spanning from July 13–14, 2023, in which Plaintiff continued to complain that Jay was requesting Plaintiff perform certain job tasks. [ECF No. 63-6 ¶ 18, ECF No. 63-6 at 24–27]. In her July 14, 2023 email to Jay, Plaintiff stated her belief that the "main friction" between herself and Jay was the job duty issue. *Id.*

10

On July 18, 2023, Helms consulted with Tara Myers, an HRD at a separate Encompass-affiliated hospital, to verify whether the job duties being performed by Plaintiff were within the normal scope of her role as HRA. [ECF No. 63-6 ¶ 20, ECF No. 63-6 at 35–37]. These HRA duties included recruiting efforts, onboarding processes, and orientation duties, all derived from a daily/weekly plan coordinated between the HRD and HRA. *See id.*

That same day, Helms sent Plaintiff's job duties to Jay and Kim Franklin ("Franklin"), a Senior Human Resources Director at a separate Encompass-affiliated hospital, to outline items that either were performed by others or Plaintiff refused to perform. [ECF No. 63-6 ¶ 21, ECF No. 63-6 at 39–45]. Per Jay's response, there were several job duties that Plaintiff had refused to complete, leaving Jay to perform these tasks. *See id.*

Additionally, Helms spoke with Kayla Peoples ("Peoples"), Chief Nursing Officer, on July 18, 2023, about Plaintiff's work performance and relationship with Jay. [ECF No. 63-6 ¶ 22, ECF No. 63-6 at 47]. Peoples explained Plaintiff had "completely shut down" and "hasn't been helpful" since Defendant hired Jay. *Id.* Peoples stated Plaintiff had not been helpful in any changes within the department, while Jay was willing to help in any way. *Id.* Lastly, Peoples stated that Plaintiff's frustrated work performance and unwillingness to work

with Jay and help with changes within the department began before Plaintiff took FMLA leave. *Id.*

On July 24, 2023, following Helms's investigation into Plaintiff's job duty concerns, Helms spoke with Plaintiff about her investigation and informed her that Butler and Jay would be discussing the issues further with her. [ECF No. 63-6 ¶ 24, ECF No. 63-6 at 56–58]. Plaintiff continued to lodge general allegations against Jay during this conversation, including her allegation that Jay displays poor work ethic, Jay tried to redirect job duties to other employees, and Jay does not give Plaintiff a direct answer. *Id.* Plaintiff did not suggest that Jay was acting in this manner because of Plaintiff's use of FMLA or ADA-protected leave or based on any disability. *Id.*

G.    Jay Reports Plaintiff

During this same period, on July 17, 2023, Jay forwarded a string of emails to Helms, in which Plaintiff called Jay a liar. [ECF No. 63-6 ¶ 19, ECF No. 63-6 at 29–33]. Helms made Butler aware of these emails. *Id.* On July 18, 2023, Butler informed Plaintiff that her emails to Jay were highly inappropriate and must stop immediately. *Id.* Butler did not issue Plaintiff any disciplinary action for these emails in hopes that she would improve her behavior and conduct towards Jay. [ECF No. 63-4 ¶ 21].

H.     Butler and Jay Counsel Plaintiff

On August 1, 2023, Jay and Butler met with Plaintiff to discuss Plaintiff's job assignments and her work hours. [ECF No. 63-4 ¶ 22, ECF No. 63-5 ¶ 20]. Due to Jay's previous conversations with Plaintiff about her work schedule [*see* ECF No. 63-5 ¶ 19] and her failure to confirm a set work schedule, it was established that Plaintiff's work schedule would be from 8:30 a.m. to 5:30 p.m. [ECF No. 63-4 ¶ 22, ECF No. 63-5 ¶ 20].

Butler and Jay again met with Plaintiff on August 2, 2023, in response to Plaintiff's complaints that she was being required to perform duties[5] not inherent to her position. [ECF No. 63-4 ¶ 24]. Butler testified it was clear to him that Jay was not requiring Plaintiff to perform job duties outside of her position's duties, and he understood that Plaintiff's workplace grievances were resolved during this meeting. *Id.*

On August 17, 2023, Butler issued Plaintiff the following verbal counseling:

> Reason for Action/Facts Related to lncident(s): You have been verbally counseled on numerous occasions concerning your work schedule. Tykee this is a formal verbal counseling due to our email discussions concerning your work schedule. My expectations are that you work 8:30am to 5:30pm with an hour lunch break from

---

[5] Plaintiff previously performed these duties for Shellouff, the former HRD. [ECF No. 63-4 ¶ 20, ECF No. 63-6 ¶ 14]. However, Plaintiff did not raise any issues with performing these duties at Shellouff's direction. [ECF No. 63-4 ¶ 20].

2pm–3pm. In addition, I am requiring you to use the Beaton for clocking in/out. Any deviation from this schedule will need to be approved by Kiona Jay, Human Resources Director.

[ECF No. 66-21, ECF No. 63-4 ¶ 25, ECF No. 63-5 ¶ 21].

On August 24, 2023, Plaintiff emailed Helms to express her belief that she was being "retaliated" against in the form of receiving the August 17, 2023 verbal counseling described above. [ECF No. 66-21]. After reviewing Plaintiff's email, Helms spoke with Plaintiff and understood that the issues were resolved. [ECF No. 63-6 ¶ 26].

Thereafter, Plaintiff continued to express concerns about her work schedule. [ECF No. 63-4 ¶ 26, ECF No. 63-5 ¶¶ 22–23, *see also* ECF No. 66-23, ECF No. 66-24]. In response, Butler and Jay again met with Plaintiff to discuss her work schedule. [ECF No. 63-4 ¶ 26, ECF No. 63-5 ¶¶ 22–23]. Butler, Jay, and Plaintiff agreed that Plaintiff's work schedule moving forward would be from 8:45 a.m. to 5:30 p.m. with a 45-minute lunch break, and Plaintiff's verbal counseling was amended on September 12, 2023, to document this change. [ECF No. 66-22].

I.     Butler Issues Plaintiff a Written Warning

On September 15, 2023, Defendant issued Plaintiff another written warning. [ECF No. 66-25, ECF No. 63-4 ¶ 31]. This disciplinary action stemmed from an email Plaintiff sent to Helms and Crossland, stating in

relevant part, "[y]et, Monday and Wednesdays full conversations was recorded to prove my claims." [ECF No. 66-24, ECF No. 66-25]. In the same email, Plaintiff stated: "[t]he only reason [Jay] and I have tension is because she does not want to complete all her job duties and aimed to transfer them to me." *Id.*

In addition to Defendant's cellular phone/mobile devices policy discussed above, Butler and Jay informed Plaintiff on multiple occasions that recording conversations in the workplace—including conversations with Jay—was strictly prohibited. [ECF No. 63-4 ¶¶ 29–30].

J.     Plaintiff's Termination

On November 15, 2023, Trent Huechtker ("Huechtker"), Business Development Director, emailed Butler and Jay about an interaction that occurred earlier that day between Plaintiff and Jay. [ECF No. 63-7 ¶ 5]. Huechtker stated as follows:

> I wanted to bring to light the interaction with you and Tykee in the office area. These meetings take place daily and have become disruptive. I cannot hear the details or context of the meeting because I'm coming and going and working on my own task. However, is sounds hostile and argumentative. The primary person I'm hearing is Tykee. My staff has said that "this has become ridiculous". They are in cubicles and on the phone with insurances. This is now a distraction. So, I was questioned today by my staff to say "do you hear Tykee, raising her voice and fighting with Kiona". They have stated that they can't work during these interactions.

[ECF No. 63-7 at 5].

In response, Helms interviewed other employees who were in the vicinity of Plaintiff's interaction with Jay. [ECF No. 63-6 ¶¶ 32–33]. One employee interviewed, Chiquite Thompson ("Thompson"), provided the following responses to Helms' questions during her interview, as found in Helms' notes:

> • **Have you noticed anything unusual or concerning regarding communication in the area?** "HRD and the lady who works under her, their conversations take place out in the open in her area."
> • **How do those conversations go?** "They are a little hostile, or maybe even aggressive. More aggressive than assertive. Takes a negative tone rather than a positive one."
> • **Is it both or one person?** "Not the HRD but the person who works under her. Her tone is the one who becomes more aggressive."
> • **Do you think this occurred last Wednesday? The 15th?** "I know it was last week. I think it was last Wednesday" This was the 15th. Chiquite felt horrible for HRD based on the way she was being spoken to. "HRD's tone was welcoming."
> • **Anything else that you think would be important for me to know?** "I want to say again I have no idea what the issue is, it just comes off that the issue is the HRA is very angry with the HRD. HRA said she does not feel current HRD is competent to do her job. Said she would have HRDs job, and she should be paid more. HR might have displaced anger when not getting the HRD position that she applied to."

[ECF No. 63-6 at 91, ECF No. 63-8 (Thompson affidavit affirming the accuracy of the above notes)]. Another employee interviewed, Tianna Miller ("Miller"), provided the following responses to Helms' questions:

> • **Have you noticed anything unusual or concerning regarding communication within your area?** "Yes" past month or two Tianna noticed the HRD and HRA having meetings in administrative area. Last encounter caused Tianna to get up due to the aggressive tone. HRA talking to HRD in aggressive tone. Saying things like

"you never told me that." Tianna also used the word disrespectful
when referencing the conversation between HRA and HRD.
· **Was HRA refusing to do things?** "Yes, HRA was openly refusing
work assigned by the HRD. HRA said "well I'm just not going to do
anything anymore."
· **Do you remember what day?** "November 15" Tianna also
mentioned this was not the first time, but the worst time that this
inappropriate communication too [sic] place.

[ECF No. 63-6 at 92, ECF No. 63-9 (Miller affidavit affirming the accuracy of

the above notes)].

During a conversation that Butler and Helms had with Plaintiff to

gather her side of the story, Plaintiff conceded that she got frustrated and

raised her voice. [ECF No. 63-4 ¶ 34, ECF No. 63-4 at 71]. Based on Helms's

investigation, Helms concluded that Plaintiff had engaged in unprofessional

and disruptive behavior towards Jay in violation of Defendant's company

policies on disruptive behavior. [ECF No. 63-6 ¶ 34].

Defendant has offered evidence that Jay was not the decision maker for

any disciplinary action that Plaintiff received; rather, Butler was the ultimate

decision maker for all of Plaintiff's disciplinary actions, including her

termination. [ECF No. 63-4 ¶¶ 27, 38, ECF No. 63-5 ¶ 40].

On November 29, 2023, Plaintiff was informed the investigation was

ongoing and to not return to work until it was resolved. On November 30, 2023,

Plaintiff was informed the investigation was complete and that "the allegation

is insubordination, not failing to complete tasks." [ECF No. 66-19]. Plaintiff's

termination letter dated November 30, 2023, provides as follows:

> Reason for Action/Facts Related to Incident(s):
>
> On 11/15/2023, Scott Butler, CEO, received a report that Tykee Walmsley engaged in disruptive behavior during a "morning huddle" meeting with Kiona Jay, HR Director. The meeting took place in the central area of the Administration department, and Ms. Walmsley's behavior was witnessed by co-workers. Co-workers heard Ms. Walmsley raising her voice at Ms. Jay and arguing with her. It was reported that Ms. Walmsley stated she was refusing to complete certain tasks requested by Ms. Jay. When interviewed by Scott and Kelly Helms, HR Business Partner, on 11/28, Ms. Walmsley stated that during the meeting with Ms. Jay, she got extremely frustrated and raised her voice.
>
> Policy# 416—Disruptive Behavior, states that "All individuals within the hospital shall be treated with courtesy, respect and dignity, in accordance with the Standards of Business Ethics and Conduct. To that end, all employees are required to conduct themselves in a professional and cooperative manner at all times."
>
> This witnessed interaction disrupted the work environment, created a distraction in the workplace, and prevented staff from completing their job duties. Ms. Walmsley failed to conduct herself in a professional and cooperative manner and her behavior is considered a form of insubordination.

[ECF No. 66-20].

II.    Discussion

A.    Standard on Motion for Summary Judgment

The court shall grant summary judgment "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled

to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the

development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

B.     Analysis

1.     Plaintiff's Motions to Strike

The undersigned grants Plaintiff's motion to amend her motion to strike [ECF No. 72, *see also* ECF No. 70] and turns to Plaintiff's arguments made in the motion and her additional motion to strike. [ECF Nos. 66, 72].

Plaintiff challenges Defendant's failure to provide Fed. R. Civ. P. 26(a)(1) disclosures, including failure to provide contact and subject-matter information concerning individuals likely to have discoverable information. [ECF No. 66 at 2–3].[6] Plaintiff also argues in support of her motions to strike that "[a]fter discovery closed, Defendant filed multiple declarations signed between June 27 and July 10, 2025, that were never disclosed during

---

[6] Defendant notes that "[t]o date, Plaintiff has not provided Defendant with a notice of witnesses pursuant to the same local rule, nor has Plaintiff submitted her own 26(a)(1) disclosures." [ECF No. 68 at 2 n.1].

discovery" and also challenges Helms' "investigation notes." [ECF No. 72-1 at 1–2].[7]

As Defendant notes, the court did not order the parties to engage in a Fed. R. Civ. P. 26(f) conference or exchange Fed. R. Civ. P. 26(a)(1) initial disclosures. [*See* ECF Nos. 25, 48 (scheduling orders)]. As stated by this court, "[b]ecause the Magistrate Judge did not require a Rule 26(f) conference in his scheduling orders, a Rule 26(f) conference is not required in this case." *Singletary Wachovia Mortg. Corp.*, C/A No. 2:11-484-RMG, 2012 WL 2889280, at *2 (D.S.C. July 16, 2012) (citations omitted)); *see also Skripchenko v. VIRxSYS Corp.*, C/A No. TDC-13-0004, 2014 WL 4826788, at *7 (D. Md. Sept. 26, 2014) ("In this instance, there was no violation of Rule 26(a) because the parties were not required to make Rule 26(a)(1) initial disclosures in this case, *see* Scheduling Order at 2.").[8]

---

[7] The court declines to address Plaintiff's additional arguments, not addressed above and contained in the section "contradicting documents." The submission of contradictory documentation, to the extent the documents are contradictory, is not a basis for striking those documents here. Additionally, the court declines Plaintiff's invitation for the court to take "judicial notice of contradictions."

[8] Defendant argues, notwithstanding, that it has "provided Plaintiff with a witness list (ECF No. 66-1), an updated witness list (ECF No. 66-3), and introduced seventy-three (73) documents as exhibits to her deposition, despite the absence of a single discovery request to Defendant issued by Plaintiff." [ECF No. 68 at 6].

As to the affidavits Defendant submitted, signed after the close of discovery, Plaintiff challenges affidavits submitted by Jay, Butler, Helms, Thompson, Huechtker, Celeste Marthers, and Miller. [ECF No. 66 at 4]. Except for Miller, Plaintiff concedes each of these individuals were listed by name in Defendant's witness lists provided to Plaintiff. Plaintiff does not offer, nor is the court aware, any case law directing to the court to strike such affidavits in this context, in particular where Plaintiff failed to seek any discovery from Defendant or take any depositions and where Plaintiff herself identified Helms, Butler, and Jay as persons who could have knowledge related to this matter. [*See* ECF No. 68 at 4–5, *see also id.* at 7 ("Despite knowing the identity of Defendant's possible witnesses for over four (4) months prior to filing this Motion, Plaintiff has taken no steps to depose these individuals, request any additional information concerning the witnesses, or submit discovery responses to Defendant concerning these individuals.")]. As directed by Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Defendant concedes that Miller was not disclosed during discovery. Defendant argues, however, that its "inadvertent omission is harmless because

Miller's Declaration served only to supplement the authentication of her witness interview with Kelly Helms." [ECF No. 68 at 7 n.6].

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Fourth Circuit has explained the following factors may guide a district court's analysis in determining whether a nondisclosure was substantially justified and/or harmless:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). "Notably, a district court is not *required* to tick through each of the Southern States factors, and retains broad discretion in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." *Benjamin v. Sparks*, 986 F.3d 332, 343 (4th Cir. 2021) (cleaned up); *see also Jones v. Town of Spring Lake, NC*, No. 20-1957, 2022 WL 1467709, at *2 (4th Cir. May 10, 2022) (affirming district court's admittance of affidavits in support of summary judgment, finding *Southern States* factors

23

did not weigh in the plaintiff's favor where he "does not appear to have been harmed by the nondisclosure").

Here, to the extent Defendant violated applicable rules in failing to disclose Miller as a witness, Plaintiff has failed to support her motions to strike considering the *Southern States* factors, particularly where she has failed to show the nondisclosure of Miller harmed her.[9]

As to her challenges to Helms' notes, Plaintiff is correct that the individuals interviewed by Helms—Thompson and Miller—did not sign the interview notes; however, Thompson and Miller both submitted a declaration confirming that "Kelly Helms's November 21, 2023, investigation notes are an accurate description of the information that [they] provided to her during [the] discussion on November 21, 2023." [ECF Nos. 63-8, 63-9]. Plaintiff fails to acknowledge the content of Thompson and Miller's declarations, and the court denies Plaintiff's motion to strike this evidence. *See, e.g.*, Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").[10]

---

[9] The court cannot discern the basis for Plaintiff's challenge to the 78 exhibits used at her deposition where she sought no discovery from Defendant prior to her deposition and where she is relying on those same exhibits in support of her opposition to Defendant's motion for summary judgment.

[10] Plaintiff also claims that Helms' notes are fabricated because of conflicting dates. However, Plaintiff has failed to provide any evidence other than her own unsupported testimony that the difference in dates creates an inference that

In sum, Plaintiff's motions to strike are denied.

    2.        Defendant's Motion for Sanctions

Defendant argues as follows:

> These photographs (ECF No. 66-10) and text messages (ECF No. 66-11)—appear to be the evidence upon which Plaintiff primarily relies in support of her ADA failure to accommodate claim. Because Plaintiff failed to produce them in response to Defendant's Requests for Production and failed to comply with the Court's Discovery Orders, Defendant seeks sanctions against Plaintiff in the form of striking such evidence and prohibiting Plaintiff from using such evidence in support of her claims pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(ii). *See Hoyle v. Freightlinger*, LLC, 650 F.3d 321, 329–30 (4th Cir. 2011) (affirming exclusion of evidence first introduced at summary judgment and not produced during discovery). Alternatively, Defendant requests that the Court strike Plaintiff's ADA failure to accommodate claim altogether pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(iii).

[ECF No. 69 at 4].

Plaintiff states that "the text messages at issue were timely provided to Defendant . . .," but also states that "[w]hile gathering evidence to respond to Defendant's untimely and misleading declarations, Plaintiff discovered that those text messages, in addition to other documents would not properly load due to technical issues . . . ." [ECF No. 73 at 2–3]. Defendant's counsel represents he did not receive the text messages at issue. [ECF No. 75 at 2].[11]

---

these notes were fabricated, particularly where it is undisputed that Defendant investigated Plaintiff prior to her termination.

[11] As to Plaintiff's challenged photo exhibit, the court does not, and need not,

The court, in its discretion, denies Defendant's motion where it is unclear that Plaintiff acted in bad faith and where there appears to be limited prejudice to Defendant. *See Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 124 (4th Cir. 2019) ("In determining the appropriate sanctions to impose under Rule 37, [courts] consider (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would [be] effective.").

### 3.   Defendant's Motion for Summary Judgment

#### a.   ADA Claim for Failure to Accommodate

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This "includes . . . not making reasonable accommodations." 42 U.S.C. § 12112(b)(5)(A). To establish a claim for a failure to accommodate, a plaintiff must show that (1) he suffers a disability; (2) his employer had notice of the disability; (3) with reasonable accommodations, he is otherwise qualified to perform the employment position in question; and (4)

---

rely on this exhibit to resolve Defendant's motion for summary judgment. [ECF No. 66-10].

his employer refuses to make such reasonable accommodations. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citations omitted).

The plaintiff bears both (1) the burden of identifying an accommodation that would allow a qualified individual to perform the job, and (2) the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. *Maffett v. City of Columbia*, C/A No. 3:19-0832-MGL, 2021 WL 4237189, at *7 (D.S.C. Sept. 17, 2021) (citing *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 197 (4th Cir. 1997) (overruled on other grounds by *Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999)). "A reasonable accommodation is one that is feasible or plausible." *Id.* (citing *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 414 (4th Cir. 2015)).

Defendant argues that Plaintiff cannot establish a prima facie case of ADA failure-to-accommodate where Defendant did not refuse to provide her accommodations. [*See* ECF No. 63-1 at 16]. In response, Plaintiff argues that Jay repeatedly and illegally denied her requests for accommodations and lied about her actions. [*See* ECF No. 66-9 at 5–13 (Plaintiff's response)].

However, Plaintiff fails to offer evidence in support of her allegations, and the evidence in record, taken in light most favorable to her, indicates, at most, that she requested the accommodation of dim lighting and a quiet

workspace, as needed, sometime in February 2023.[12] Thereafter, she was provided this accommodation,[13] although discussions about the necessary paperwork, including the duration of the needed accommodation, were ongoing until roughly the end of June 2023.[14] Here, where the record shows that Plaintiff, Defendant, and Plaintiff's medical provider were engaged in requesting, obtaining, and submitting the relevant paperwork during this roughly four-month period—even if Plaintiff had not been provided accommodation during this time—the court finds that the record does not support a finding of an unreasonable delay that could constitute an ADA violation. *See Smith v. CSRA*, 12 F.4th 396, 415 (4th Cir. 2021) (finding that a five-week period between a request for a parking space and the grant of it as an accommodation did not establish an unreasonable delay in part because during that period the agency had requested and waited for updated medical documentation); *Oakley v. DeJoy*, No. 23-CV-42-FL, 2024 WL 1286205, at *7 (E.D.N.C. Mar. 26, 2024) (concluding that there was no unreasonable delay

---

[12] Plaintiff's response, as well as her testimony, indicate that she is solely challenging the dim light and quiet workplace accommodation. [*See* ECF No. 266:10-13, ECF No. 66-9 at 5–13].

[13] Defendant has submitted evidence that Plaintiff was provided accommodations effective May 2, 2023. Plaintiff, without supporting evidence, disputes Defendant's assertion.

[14] Plaintiff makes a brief reference to Defendant's failure to engage in the interactive process, but does not offer evidence in support nor explain her position. [*See* ECF No. 66-9 at 7].

where "about four months passed between plaintiff's initial request and the accommodation offer, and only about 2–3 months passed between when plaintiff updated his medical documentation and said offer").

Plaintiff additionally argues that Defendant's requirement that she work the front desk proves her ADA claim for failure-to-accommodate. However, the evidence, even taken in light most favorable to Plaintiff, does not support this conclusion. The accommodation in place for Plaintiff was dim lighting and a quiet workplace, as needed. Jay's direction for Plaintiff to resume working the front desk for 30 minutes a day is not inconsistent with this accommodation. Additionally, there is no evidence in the record that Plaintiff refused the assignment or informed Jay that she was unable to complete the assignment because of her disability. Instead, the record evidence indicates that Plaintiff repeatedly informed Jay that there were times or days she may be affected, ending with Plaintiff requesting direction from Jay as to "how to proceed when completing this duty causes a negative effect on my heath." [ECF No. 63-3 at 106].[15]

_____

[15] Plaintiff's response includes a section titled "improper inquiry into medical condition." To the extent Plaintiff is challenging Defendant's efforts to clarify her needs for accommodation, the Fourth Circuit has stated that in such circumstances, an employer is required to seek clarification. *See Kelly v. Town of Abingdon, Virginia*, 90 F.4th 158, 166 (4th Cir. 2024) ("Rather, when a valid request leaves 'the precise nature of the disability or desired accommodation' ambiguous, the employer should seek clarification.") (citation omitted)).

Plaintiff also does not directly address Defendant's evidence that after a period of working the front desk, she requested and was allowed to no longer work there. Jay has testified that she "immediately granted her request and told her that she was no longer required" to work at the front desk. [ECF No. 63-5 ¶ 17]. Instead, Plaintiff has offered related but unclear evidence that she texted Jay days that she could not work the front desk—texts that continued up to her termination—perhaps indicating that she continued to work the front desk up until she was terminated, [ECF No. 66-11], and that she felt she had "no choice" but to work the front desk after Jay told her to. [ECF No. 63-2 at 156:12–13]. But, as stated above, Plaintiff has failed to address her emails stating that she did not need accommodations all day, every day, consistent with the accommodation requests provided by her medical providers. *See also, e.g., Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1195, n.19 (10th Cir. 2018) (holding that an employer need not provide an accommodation that conflicts with a doctor's orders).

Additionally, Plaintiff fails to address Defendant's argument that it "permitted her to work primarily alone and in the dark for 7 ½ hours a day" and that "[t]o the extent Walmsley is suggesting that she should have been excused from all human interaction as a Human Resources Assistant every second of every day, that suggestion is unreasonable as a matter of law." [ECF

No. 67 at 6]. As stated by the Fourth Circuit, "[t] plaintiff 'bears the burden of demonstrating that [the complainant] could perform the essential functions of her job.'" *E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015) (citing *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994)); *see also, e.g., St. Hilaire v. Minco Prods., Inc.*, 288 F. Supp. 2d 999, 1005 (D. Minn. 2003) ("The Court finds that St. Hilaire has not shown that he could perform the essential functions of his job with reasonable accommodations because isolation is not a reasonable accommodation.").

Accordingly, the undersigned recommends the district judge grant Defendant's motion for summary judgment as to Plaintiff's ADA claim for failure-to-accommodate.

### b. ADA and FMLA Retaliation Claims

Plaintiff has asserted claims for ADA retaliation, ADA wrongful termination, and FMLA retaliation.[16] Because Plaintiff has no direct evidence in support of her discrimination and retaliation claims, she proceeds through the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973), burden-shifting framework. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541,

---

[16] Plaintiff does not address Defendant's arguments concerning her ADA wrongful discharge claim in her response. [*See* ECF No. 66-9 at 5–13].

551 (4th Cir. 2006); *see also, e.g., Gomez v. Haystax Tech., Inc.*, 761 F. App'x 220, 235 (4th Cir. 2019) (addressing Title VII, ADA, FMLA discrimination and retaliation claims).

Under this framework, "the plaintiff bears the burden of establishing a prima facie case of discrimination or retaliation." *Gomez*, 761 F. App'x at 235. If the plaintiff succeeds, "the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). "[T]he burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." *Id.* at 216.

Even assuming Plaintiff could establish a prima facie case—which Defendant disputes—she has failed to prove that the legitimate reasons Defendant offered for her written disciplinary action—that Plaintiff failed to maintain her work schedule—and her termination—that Plaintiff had violated Defendant's policy regarding disruptive behavior—is pretext for discrimination or retaliation.

Plaintiff disagrees, relying primarily on suspicious timing. Plaintiff argues as to the written disciplinary action, that she reported FMLA violations

and retaliation concerns on August 17, 2023, and was issued a disciplinary action that evening. [*See* ECF No. 66-9 at 12]. Likewise, Plaintiff notes she took protected leave on November 22 and 24, 2023, was suspended on November 28, 2023, and terminated on December 1, 2023. *Id.* at 11.[17]

Plaintiff cannot solely rely on temporal proximity to establish pretext in support of her claims. *See, e.g., Reddick v. A.O. Smith Corp.*, C/A No. 4:21-4201-RBH-SVH, 2023 WL 5431607, at *4 (D.S.C. Aug. 23, 2023) ("While temporal proximity is relevant in establishing a prima facie case of FMLA retaliation, the same level of import has not been extended to establishing pretext."); *Hall v. Sizewise Rentals, LLC*, C/A No. 3:23-04408-DCC, 2025 WL 353806, at *3 (D.S.C. Jan. 31, 2025) ("Given the lack of any other evidence of pretext, temporal proximity alone in this case is insufficient.").[18]

Plaintiff argues she was treated unfairly. However, the court does not "sit as a super-personnel department, weighing the prudence of employment

---

[17] Plaintiff also notes that the incident resulting in her termination, reported on November 15, 2023, "was never addressed previously nor documented as discipline." [ECF No. 66-9 at 11]. Plaintiff received her termination letter on November 30, 2023, and the incident, as known to Plaintiff, was investigated prior to that. The court cannot discern when this incident could have been previously addressed or documented.

[18] Plaintiff additionally argues that she was retaliated against when "Jay engaged in schedule abuse" and when she was disciplined for recording her conversation with Jay. [ECF No. 66-9 at 12]. However, Plaintiff has failed to offer evidence in support of these claims.

decisions made by the defendants." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). The court need not decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (citation omitted); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) ("It is [only] the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (citation omitted)).

Accordingly, the undersigned recommends the district judge grant Defendant's motion for summary judgment on Plaintiff's ADA and FMLA retaliation claims and her claim for ADA wrongful termination.

### c.     FMLA Claim for Interference

As explained by the Fourth Circuit:

> [T]o make out an FMLA interference claim, an employee must demonstrate (1) that he is entitled to an FMLA benefit; (2) that his employer interfered with the provision of that benefit; and (3) that the interference caused him harm. *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015). The FMLA "provides no relief *unless the employee has been prejudiced* by the violation." *Ragsdale*, 535 U.S. at 89, 122 S.Ct. 1155 (emphasis added).

*Adkins v. CSX Transportation, Inc.*, 70 F.4th 785, 796 (4th Cir. 2023).

First, Plaintiff has offered no evidence that she has been prejudiced by any alleged violation of her FMLA rights. For a violation to be prejudicial, the

employee "must lose compensation or benefits or suffer other monetary losses as a direct result of the violation or be denied employment, reinstatement, or promotion." *Boulware v. S.C. Dep't of Health & Hum. Servs.*, C/A No. 3:17-1110-MGL-PJG, 2017 WL 9275286, at *2 (D.S.C. Aug. 23, 2017), report and recommendation adopted, C/A No. 3:17-01110-MGL, 2017 WL 4401673 (D.S.C. Oct. 4, 2017).

Second, Plaintiff has failed to show that her FMLA rights were interfered with. Plaintiff disagrees, first reasserting her previously-made arguments that Defendant failed to provide her with reasonable accommodations [*see* ECF No. 66-9 at 9–10], arguments discussed and rejected above. *See also Kolbe v. NSR Marts, Inc.*, C/A No. 23-1482-PJM, 2023 WL 5759279, at *3 (D. Md. Sept. 6, 2023) ("Although an employer would be obligated to provide reasonable accommodations under the [ADA] or other laws, an employer is not required to do so under the FMLA.").

Second, she argues as follows:

Defendant required Plaintiff to take additional leave beyond what was medically necessary, insisted all absences be filed under FMLA, and prohibited Plaintiff from working without a return-to-work note.

[ECF No. 66-9 at 10].

35

Plaintiff also testified as follows:

Q.    And we'll talk about these in more detail. FMLA, what are you claiming?

A.    Violation-wise is making me make—making me take more time than I needed. So like when I—when I wanted to come back to work, just take the rest of the day, file FMLA time. You're not supposed to make me use or claim to say— document FMLA time if it wasn't needed for that or if I was able to return back to work. Workplace accommodations under FMLA too. Because when I initially—well, it went from ADA—FMLA to ADA. So my workplace accommodation that was needed from under FMLA to—failing for that one.

[ECF No. 63-2 at 46:3–15].

The only evidence offered by Plaintiff in support of this claim is a text message exchange between her and Jay in which Jay stated "Thanks for the update. Make sure you [communicate] with FMLA about your documentation and return." [ECF No. 66-18].

The undisputed record shows that once Plaintiff became eligible for FMLA benefits on February 21, 2023, all her requests for FMLA leave were approved. Plaintiff has failed to provide any evidence that either her FMLA rights were interfered with or that prejudice ensued.

Accordingly, the undersigned recommends the district judge grant Defendant's motion for summary judgment as to her FMLA interference claims.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned grants Plaintiff's motion to amend [ECF No. 72], denies Plaintiff's motions to strike [ECF Nos. 66, 70], denies Defendant's motion for sanctions [ECF No. 69], and recommends the district judge grant Defendant's motion for summary judgment. [ECF No. 63].

IT IS SO ORDERED AND RECOMMENDED.

October 1, 2025                                    Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).